## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>        **Plaintiff,** <br>  **v.** <br><br> **JAY SCOTT KIRK LEE, GEOFFREY ALLEN WALL, and BENJAMIN THOMPSON KIRK,** <br><br>       **Defendants.** | **Civil Action No. 21-CV-_____ (___)** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission, (the "Commission"), alleges the following against defendants Jay Scott Kirk Lee ("Lee"), Geoffrey Allen Wall ("Wall"), and Benjamin Thompson Kirk ("Kirk"), (collectively, the "Defendants").

## SUMMARY

1.  This case concerns a sophisticated, multiyear, stock manipulation scheme impacting United States markets and retail United States investors. Through this scheme, Defendants fraudulently sold the stocks of as many as ten different U.S. quoted penny stocks (hereinafter the "Issuers"), netting scores of millions in illicit proceeds.

2.  From at least 2012 through at least 2016, Defendants engaged in a deceptive scheme to disguise their massive, coordinated dumps of stocks whose purportedly free-trading shares they entirely or virtually entirely controlled, as ordinary secondary market sales by unaffiliated shareholders scattered across the world. In doing so, Defendants primarily utilized the illicit services of an offshore platform ("the Sharp Platform") headed by Canadian Frederick L. Sharp.

3.      All of the stocks comprising Defendants' scheme were subject to the federal securities laws' requirements: (i) that greater than 5% beneficial owners disclose their holdings, any material changes thereto, and any agreements concerning the disposition thereof, on Schedule 13D filings with the Commission; and (ii) that greater than 10% beneficial owners disclose all of their trading in each stock, regardless of quantity, on Forms 4 filed with the Commission.

4.      In conducting the fraudulent scheme, Defendants used a varying array of foreign *alter ego* front companies, most supplied by the Sharp Platform, which they used to fraudulently conceal Defendants' ownership and control of each Issuer's purportedly unrestricted shares in order to get past gatekeepers (transfer agents and brokers) who would otherwise have treated Defendants' shares as restricted stock, that could not be purchased, sold or transferred except under extremely limited circumstances.  Defendants then used these mostly Sharp Platform-supplied front companies, as well as Sharp Platform-supplied encrypted communication and accounting services, to secretly:

     a.   maintain their coordinated control over all or virtually all the shares available for trading of each Issuer;

     b.   arrange and fund misleading promotional campaigns touting each stock;

     c.   unload massive quantities of each stock into the very price and demand rises that had been triggered by those campaigns; and

     d.   reap their resulting illicit gains through, among other devices, directing stock-sales proceeds distributions into their secret sub-accounts on the Sharp Platform;

all while flouting their affirmative reporting obligations under the federal securities laws – as controlling shareholders of each Issuer – to report their holdings and trading.

5.      In short, Defendants fraudulently deprived gatekeepers and investors of the full and fair disclosure mandated by the federal securities laws, and hoodwinked investors into thinking they were participating in ordinary secondary market trading when, in reality, they were buying shares in Defendants' dumps.

**The Sharp Platform**

6.      Beginning in or before 2010 and continuing throughout the time period encompassed by this Complaint, the Sharp Platform – which was operated by Sharp and his subordinates, Zhiying Yvonne Gasarch ("Gasarch"), and Courtney Kelln ("Kelln") – was in the business of facilitating illegal stock sales in the public securities markets.  The Sharp Platform provided a variety of services to help corporate control persons (like Defendants) conceal their identities when selling the stock of penny stock companies they controlled.  By utilizing the Sharp Platform's services to disguise their identities and their controlling positions, Defendants fraudulently concealed the fact that public company control persons were selling large blocks of stock to unsuspecting investors.

7.      The Sharp Platform deliberately concealed the identities of its clients through the array of services it offered, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; providing and administering an encrypted communication network; purchasing, configuring and delivering devices to which the Sharp Platform referred as "xPhones," which were designed to be used only for communications on the Sharp Platform's encrypted communications network; and arranging for clients to deposit stock in offshore trading platforms to obfuscate the control persons' association with their public

3

company stock.  As detailed below, Defendants utilized all the foregoing Sharp Platform services in carrying out their fraudulent scheme.

8.      The Sharp Platform also provided various additional services to the Sharp Platform's clients in furtherance of their fraudulent schemes such as: administering a proprietary accounting system that tracked clients' total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world and/or to clients' internal subaccounts on the Sharp Platform; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments.  The Defendants also utilized all the foregoing additional Sharp Platform services in carrying out their fraudulent scheme.

9.      The Sharp Platform's operators (Sharp, Kelln and Gasarch) were each sued by the SEC for violations of the securities laws on August 5, 2021.  *See SEC v. Frederick L. Sharp, et al*, No. 1:2021-cv-11276-WGY (D. Mass).  Sharp and Kelln were also charged criminally by the United States Department of Justice.  See https://www.justice.gov/usao-ma/pr/four-individuals-charged-long-running-global-pump-and-dump-scheme.

### Defendants Violated Various Securities Laws

10.     As a result of the conduct alleged herein, Lee, Wall, and Kirk violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder, and Sections 5(a) and 5(c) of the Securities Act.

11.     The Commission seeks permanent injunctions against Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act;

civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the

Exchange Act; an order barring Defendants from participating in any offering of a penny stock,

pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act;

conduct-based injunctions enjoining Defendants from directly or indirectly, including, but not

limited to, through an entity owned or controlled by any of them, participating in the issuance,

purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent

Defendants from purchasing or selling securities listed on a national securities exchange for their

own personal account; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), 78aa].

13.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices,

transactions and courses of business alleged in this Complaint occurred within the District of

Massachusetts, and were affected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, retail investors residing within this Judicial District purchased stock in Nutranomics

and Ami James, both of which are discussed below.

## DEFENDANTS

14.    **Jay Scott Kirk Lee** ("**Lee**"), age 38, is a Canadian citizen believed to be currently residing in Vancouver, British Columbia, Canada.  As detailed below, Lee oversaw promotional campaigns touting issuers' stock.

15.    **Geoffrey Allen Wall** ("**Wall**"), age 49, is a Canadian citizen believed to be currently residing in Saanich, British Columbia, Canada.   As detailed below, Wall oversaw sales of, and other trading in, the various issuers' stock.  Wall has been associated (as a stockbroker) with foreign brokerage houses, including a firm in the Bahamas.

16.    **Benjamin Thompson Kirk** ("**Kirk**"), age 43, is a Canadian citizen believed to be currently residing in Hope, British Columbia, Canada.  As detailed below, Kirk assisted with promotional campaigns concerning the various issuers' stocks.  Kirk committed most of the illegal conduct described herein after the Commission filed an enforcement action against him for penny stock fraud.  See *SEC v. Benjamin T. Kirk et al.*, Civil Action No. 13-CV-1735 (S.D.N.Y, filed March 15, 2013).

## RELATED PARTIES

17.    **Frederick Langford Sharp**, ("Sharp") age 69, resides in West Vancouver, British Columbia, Canada.  Sharp, along with two other operators of the Sharp Platform (Kelln and Gasarch), is currently a defendant in *SEC v. Frederick L. Sharp, et al*, No. 1:2021-cv-11276-WGY (D. Mass), a case pending in this District.

18.    **Nutranomics Inc.** (CIK 0001451433), known as Buka Ventures Inc. until September 2013 ("**Nutranomics**"), is a Nevada Corporation headquartered in Salt Lake City, Utah, that was, at all relevant times, purportedly in the business of nutritional food product research, development and sales.  The company filed a Form 8-A12G on January 12, 2009, to

register its common stock under Exchange Act Section 12(g); the company terminated its Exchange Act registration on July 5, 2018. At all relevant times, Nutranomics' securities were quoted on OTC Link under the symbol "NNRX," and it filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Exchange Act Section 13(a) and rules thereunder.

19.     **Ami James Brands, Inc.** (CIK 0001557565), known as Quorum Corp until July 2015 ("**Ami James**") is a Nevada corporation headquartered in Miami Beach, Florida that, at all relevant times, was purportedly in the business of fashion apparel design, marketing and distribution. The company filed a Form 8-A12G on January 1, 2016, to register its common stock under Exchange Act Section 12(g); on November 18, 2018, the Commission issued an order revoking that registration. At all relevant times, Ami James's securities were quoted on OTC Link under the symbol "AJBI," and it filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Exchange Act Section 13(a) and rules thereunder.

## BACKGROUND

20.     Before selling stock, control persons are required to: (a) register such sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell. In addition, with respect to public companies whose securities are registered under Section 12 of the Exchange Act, investors owning 5% or more of such company's publicly traded stock are required publicly to disclose their ownership interest, while investors owning 10% or more of such company's publicly traded stock are required publicly to disclose all of their trading in that stock, regardless of quantity. Such registration requirements,

sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, to inform investors about the nature of the stock they are holding or considering buying, and to alert investors when control groups, affiliates, or major shareholders sell their shares.

21.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer.  As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

22.     "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission.  All stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also includes identification of any person or group who is the beneficial owner of more than 5% of the company's securities.

23.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement.  Registration statements are transaction specific, and apply to each

separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. Thus, when a control person buys publicly traded or otherwise unrestricted shares in a company that s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate.  Such legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

24.     A "transfer agent" is a business that facilitates certain types of securities transactions.  Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether particular shares are restricted from resale.

25.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

26.     "S-1 Registration Statement(s)" refer(s) to SEC Form S-1, which is a registration statement filed publicly by an issuer in connection with the sale of stock to shareholders. "S-1 Shareholders," as used herein, means shareholders who acquired stock pursuant to an S-1 Registration Statement.

27.     A "DTC eligible" security is one that is freely tradeable, fungible, and qualified to be held at the Depository Trust Company (DTC) and traded and serviced through DTC's electronic book-entry system, thereby rendering it rapidly tradeable.

## OVERVIEW OF DEFENDANTS' CONDUCT

### Scheme to Conceal Defendants' Control and Stock Ownership

### Background:  The Sharp Platform Specialized in Obfuscating Its Clients' Beneficial Ownership and Control

28.     From approximately 2010 through at least 2019, the Sharp Platform facilitated illegal sales of stock in hundreds of penny stock companies.

29.     As reflected in the table below, the Sharp Platform's stock sales generated over one billion dollars in gross proceeds:

| YEAR | STOCK SALES ($) | STOCK PURCHASES ($) | NET SALES ($) |
|------|----------------:|--------------------:|--------------:|
| 2010 | $          40,452,026 | $          (7,344,138) | $          33,107,888 |
| 2011 | $        198,245,334 | $        (67,424,315) | $        130,821,019 |
| 2012 | $        205,403,649 | $        (60,952,750) | $        144,450,899 |
| 2013 | $        290,452,161 | $        (62,460,290) | $        227,991,871 |
| 2014 | $          64,960,760 | $          (6,612,156) | $          58,348,605 |
| 2015 | $          22,057,413 | $          (2,631,013) | $          19,426,400 |
| 2016 | $          68,171,713 | $          (9,861,177) | $          58,310,536 |
| 2017 | $          86,158,566 | $        (15,867,701) | $          70,290,865 |
| 2018 | $          31,155,352 | $          (4,674,550) | $          26,480,802 |
| 2019 | $            1,702,074 | $             (889,639) | $               812,435 |
| **TOTAL** | $    1,008,759,049 | $      (238,717,730) | $        770,041,319 |

30.     Sharp, who used the code name "Bond," (styling himself after the fictional character *James Bond*) was the mastermind and leader of the Sharp Platform.  Among other things, Sharp cultivated relationships with the Sharp Platform's clients—that is, individuals seeking fraudulently to sell stock in the markets to retail investors—and with various offshore trading platforms.  Sharp also routinely served as a liaison between dozens of clients and trading platforms.

31.     During the period of the scheme detailed herein, Sharp described in a communication to a client the following about the Sharp Platform's services: "The service

provided is comprehensive; it is not limited to trading.  It includes pyaments [sic], loans, private placements **and keeping clients out of jail.**" (Emphasis added).

32.    Sharp oversaw the creation and deployment of various front companies, which served as nominee shareholders used to disguise his clients' stock ownership and to sell stock surreptitiously.

33.    One of the services provided by the Sharp Platform was making available offshore corporate nominee shareholders and individuals who would serve as the nominal owners of those entities.  Sharp installed these various nominal owners to pose as the beneficial owners of the various entities that served as nominee shareholders.  In actuality, these individuals did not own or control the stock held by the nominee shareholders and generally had no role other than offering their names, passports, and signatures, which the Sharp Platform used to incorporate and open accounts for the corporate nominees.  In dealing with banks, brokerages, and other financial services providers, these individuals were held out as actual beneficial owners.  In this way, the Sharp Platform kept the identities of control groups hidden, while fraudulently appearing to satisfy the compliance requirements of the banking and securities firms where the Sharp Platform opened these accounts.

34.    Sharp hired and directed various individuals to operate the administrative services offered by the Sharp Platform.  Sharp oversaw the creation of a network of encrypted communications, including code-names for the users, encrypted electronic chat functions, and encrypted email functions.[1]  The Sharp Platform purchased, configured and delivered devices that the Sharp Platform referred to as "xPhones," which were designed to be used only for the

---

[1] Encrypted communications sent and received through the Sharp Platform-administered server are hereinafter referred to as "Encrypted Communication(s)."

Encrypted Communications.

35.    Sharp also hired and directed individuals who created and administered the Sharp Platform's accounting system, which Sharp called "Q". The Q system was essential in keeping track of the amounts of stock to be sold and the total proceeds being collected for each deal Sharp's clients ran. Accordingly, the Sharp Platform accounted for all of the nominee shareholders' assets in Q by tracking which of the nominee shareholders held which stocks (and which stocks' sales proceeds) for which particular client or client group. The Sharp Platform also relied on the Q system to calculate the commissions and fees it collected for facilitating its clients' illegal stock sales.

36.    Sharp arranged for the Encrypted Communication services and the Q accounting system to be hosted on a server that was physically located on the island of Curaçao.

37.    These services provided by the Sharp Platform aided the Sharp Platform's clients to further conceal their control by making it seem as if multiple different, unrelated offshore corporate entities each held less than five percent of the stock of a public company when, in actuality, those offshore corporate entities were all under common control by the Sharp Platform, and their stock in the public company was all held in coordinated fashion for the benefit of the Sharp Platform's clients. In this manner, the clients concealed the fact that they routinely held far greater than five percent of such public companies' stock through the various Sharp Platform-supplied nominee entities.

38.    Breaking the shares into blocks of less than five percent avoided scrutiny by brokerage firms and other market participants. Brokerage firms routinely consider the 5% ownership threshold in determining whether particular stock sales may be part of a distribution that must be registered pursuant to Section 5 of the Securities Act. Further, OTC Markets

requires public companies to disclose its five percent (or greater) shareholders to meet certain listing requirements.

39.    Once blocks of shares were broken up and dispersed among multiple nominee shareholders, the Sharp Platform coordinated with offshore trading platforms, which specialized in depositing and liquidating stock through various domestic and foreign brokerage firms in less-than-five-percent tranches.  By so doing, the Sharp Platform further obscured both the identities of the true beneficial owners and the fact that they were selling in concert.

### Defendants' Use of the Sharp Platform

40.    By September 2010, Defendants Lee, Wall and Kirk were all clients of the Sharp Platform.

41.    Also by September 2010, Lee and Wall had begun collaborating in perpetrating their penny stock fraud scheme using the Sharp Platform.  By October 2010, Lee and Wall had begun receiving – into their respective subaccounts on the Sharp Platform – distributions of their scheme's illicit proceeds.  By May 2012, Kirk began working with Lee and Wall to use the Sharp Platform to perpetrate penny stock fraud together.

42.    Over the next several years, Lee and Wall, usually working with Kirk, perpetrated a fraudulent scheme involving a series of penny stock dumps, netting Lee, Wall, and Kirk millions in illicit profits, and committing each of these dumps entirely or predominantly through the Sharp Platform.  As illustrated below, Lee's and Kirk's contributions to this scheme were primarily in orchestrating their promotion (or "pumping") side, while Wall's were primarily in orchestrating their trading (or "dumping") side, which included first ensuring the various stocks were positioned, ahead of their promotions' launch, for market sale.

43.    In conducting their fraud scheme, Defendants utilized the Sharp Platform:

a.  To disguise their illegal dumping of large blocks of stock by scattering nominal ownership of shares, in blocks of less-than-5%, across various purportedly unrelated foreign corporations;

b.  To position those various blocks of shares for market sale, as purportedly unrestricted stock, through various foreign brokerage houses;

c.  To secretly – and simultaneously with the foregoing – maintain their full control over all, or virtually all, the tradeable shares the issuers whose stocks they aimed to sell;

d.  To pay for promotional campaigns aimed at urging investors to buy shares (and, in some instances, to conceal the source of such promotional payments by identifying Sharp Platform-supplied foreign corporations as the purported "paying party" in stock promotions);

e.  To engage in manipulative trading aimed at creating the appearance of an active and rising market for shares they were promoting;

f.  To massively unload the various stocks into the demand created by their promotional campaigns; and

g.  To furtively receive distributions of their penny stock dumps' illicit proceeds.

44.    As part of the fraudulent scheme, Defendants used the Sharp Platform's encrypted communication and accounting services.  Each Defendant received an xPhone for sending and receiving encrypted communications within the Sharp Platform.  Each Defendant's xPhone had a specific identifying number, and each was also known by various specific "handles," some self-assigned by Defendants, others assigned by other Sharp Platform clients with whom Defendants communicated using their xPhones.  These numbers and handles – which appeared in the "to" or

"from" fields of the respective xPhone messages each sent or received – included:

      a.  For Lee:  the number 34, and the handle BIGBLUE, PHIL, REME, REME

           CALL, ROCK and ROCKO;

      b.  For Wall: the number 29, and the handle BAHAMAS, SENT, SHORTS,

           SUNNY and TWINS; and

      c.  For Kirk: the number 19 and 119, and the handle ELGI and BERTIE.

45.    Lee, Wall and Kirk also each held subaccounts on the Sharp Platform in which they received internal distributions of their penny stock dumps' illicit proceeds.  These subaccounts were akin to personal bank accounts, with the Sharp Platform being the banker, which were used to assign funds realized through Sharp Platform vehicles to the individual clients whose transactional activity using those vehicles had generated those funds.

46.    Lee's subaccount was called REME; Wall's was called SENT; and Kirk's was called ELGI.  Lee's and Wall's subaccounts received distributions directly from Sharp Platform accounts that were named for the ticker symbol of each Issuer that was subject of their scheme, while Kirk's subaccount received his distributions (from the penny stock dumps on which he had collaborated with Lee and Wall) from Lee's subaccount.  Kirk received his distributions through a request from Lee.  The following December 7, 2013, Encrypted Communications exchange is illustrative of how illicit proceeds distributions to the subaccounts of Lee, Wall and Kirk were effected within the Sharp Platform:

| | |
|---|---|
| Wall (to Gasarch and Lee): | Please split the following from nnrx [the Sharp Platform account encompassing Nutranomics activity:] |
| | Reme [Lee] $725,000 |
| | Sent [Wall] $725,000 |
| | Ty |
| Lee (to Gasarch and Wall): | Confirm. |
| Gasarch (to Lee and Wall): | Done |

15

Lee (to Gasarch and Kirk): Hi wires [Gasarch's xPhone handle]  Can u please internal transfer 362,500 (three hundred sixty two thousand five hundred) to the ELGI account [Kirk's subaccount].  Thnx

Gasarch (to Lee and Kirk): Done.

47.     At Defendants' request, the Sharp Platform often wired illicit proceeds that, within the Sharp Platform had been allocated to Defendants' subaccounts, to external accounts controlled by each of the Defendants individually.  When doing so, the Sharp Platform, Defendants, or both, often created phony invoices and other false or materially misleading documentation to disguise the nature of these transfers.

48.     Wall's requests for such external transfers, for example, often directed the Sharp Platform to send Wall's illicit proceeds to a Bahamas-domiciled corporate and financial services firm of which he was a client (the "Bahamian Firm").  The Sharp Platform, throughout the years, sent these payments from an array of foreign bank accounts it controlled in the names of various front companies it had established and that it used to park stock, sell it on its clients' behalf, park proceeds thereof, or all three (hereinafter "Sharp Vehicles").  These transactions were variously and falsely described.

49.     For example, in November 2016, a Sharp Vehicle transfer of $85,000 to the Bahamian Firm was papered as  proceeds of a loan from the Sharp Vehicle to the Bahamian Firm, complete with bogus loan documents; other times Sharp Vehicle transfers to the Bahamian Firm were supported by invoices for services supposedly provided by the Bahamian Firm to the Sharp Vehicle sending the wire, such as "international consulting services" (in the case of an August 2015 wire), and "provision of 3 months of services relating to the sourcing of IPO opportunities" (in the case of a June 2017 wire).

50.     In many cases, shortly after such transfers were made, at Wall's direction, to the

Bahamian firm, the Bahamian firm, in turn, wired funds to people close to Wall, including his wife, his adult daughter, and his family (for example, in May 2015, the Bahamian entity transferred $700,000 to the Wall Family Trust).

51.    For his part, Lee directed the Sharp Platform to send most of his external transfers drawn from his illicit proceeds to entities or individuals in the Eastern Hemisphere, including $5.2 million to the Mauritius bank account of a front company he controlled called Frodo Inc. At times, Lee participated directly in the process of creating the illusion of legitimate transactions.  For example, in March 2013, he wrote to Gasarch over the encrypted xPhone system:  "If I was going to send out 350k to a bank in Mauritius th[is] week, could u tell me the name of the sender now so I can furnish the bank supporting documents in advance of sending it."  Similarly, in May 2014, Lee texted Gasarch: "Hi wires [Gasarch's handle] i have 2 wires that need to be sent out one for 60k and on for about 40k.  60k is to a company and 40k an individual who should i make the invoices out to."

**EXAMPLE ONE:**

**LEE, WALL AND KIRK'S NUTRANOMICS (F/K/A BUKA) FRAUD**

52.    Defendants' Nutranomics fraud is illustrative of all the various penny stock dumps comprising their scheme.  Their first step in this particular dump was to identify a shell company and gain control of that issuer's purportedly free trading stock.  To that end, on March 26, 2013, Wall and Sharp, using their xPhones, had the following exchange of Encrypted Communications:

> Wall:   Hi fred do you have any vehicles for sale that are cleared and in the system that
>         are ready to go in case I need one?  If so how much?
> Sharp:  $500k
> Wall:   Dtc eligible?
> Sharp:  Si.  All r now dtc eli[gible] as its easy to get at the moment
> Wall:   And all the stock cleared with you?

Sharp:  50 – 90% clear with us; the balance is no problem

Wall:   ok do you have a lot?  Do you have one that has 20-25 mm free[-trading shares]?

Sharp:  Look at buka:  20m free; 26.5 m 144 [restricted]; 10.9 m cleared at bgua, bsit, heli and vpqu [Q codes for various offshore Sharp Platform vehicle accounts]; 2.25m almost cleared at verl [Q code for a Sharp Platform vehicle account in Panama]; 6.85m in free certs

Wall:   ok can you keep the BUKA for me, will hit you up later for the terms.

53.     The issuer to which Sharp was referring in the above Encrypted Communications exchange was Buka Ventures, Inc. ("Buka"), which had been incorporated in Nevada in 2007, had 46.5 million shares outstanding, and had (in October 2012) been cleared by FINRA to be quoted on OTC Markets and was DTC eligible, and whose shares, thereby, could be passed off as unrestricted.  Of Buka's 46.5 million outstanding shares, 26.5 million were restricted; and the remaining 20 million shares had been issued without restricted legends pursuant to a registration statement which the issuer had filed with the Commission on December 19, 2008, and that the Commission had declared effective on January 9, 2009.

54.     On paper, the 20 million unrestricted Buka shares covered by the S-1 were issued to more than 25 individual Fiji Islanders.  Since at least June 22, 2012, however (according to the Sharp Platform's encrypted "Q" accounting system, and consistent with Sharp's above representations to Wall), all 20 million of those shares – as well as all 26.5 million of Buka's restricted shares – were, in reality, controlled by the Sharp Platform.  Moreover, just as Sharp had informed Wall, by the time of their March 26, 2013 Encrypted Communications exchange, the Sharp Platform had already caused over half – 10.9 million – of the 20 million unrestricted shares' certificates to be deposited with various offshore brokerage firms.

55.     Within fifteen minutes of the Encrypted Communications exchange quoted in ¶ 52 above, Wall sent an Encrypted Communication to Sharp saying, "So I will take the buka, thx."  Sharp replied: "Confirmed; its yours for $500k, payable $100k/mo starting when trades

(when will that be?).  Shall we clear the remaining 9.1 m shares?  Or stay with the 10.9m

cleared?"

56.    The next day, March 27, 2013, Wall and Lee let the Sharp Platform operators

know that all communications from that point forward concerning Buka should be limited to

them.

57.    The following day, March 28, 2013, Lee informed Kirk, via Encrypted

Communication, that Buka would be the subject of Defendants' next dump.  (At the time, Kirk

was working on promos for another of Defendants' fraudulent dumps:  iTalk, Inc. (whose ticker

symbol was TALK)).  This Encrypted Communications exchange followed:

Kirk:    So talk is now, buka is next […]?
Lee:    Yes that is what G [Geoff Wall] is working on.

58.    Immediately after striking the deal for Buka, Sharp asked: "Shall we [the Sharp

Platform] clear the remaining 9.1 m[illion] Buka shares?  Or stay with the 10.9m cleared?"

59.    As subsequent events make clear, Defendants decided in the affirmative – they

arranged for the Sharp Platform to position the remaining 9.1 million Buka shares so that those

shares, too, would be ready to freely trade.  The Sharp Platform facilitated the distribution of the

remaining purportedly free-trading shares into offshore brokerage accounts under the Sharp

Platform's control.  In particular, through four separate batches of Buka share certificates, which

it sent to Buka's transfer agent on April 2d, April 4th, May 1st and August 30th, 2013, the Sharp

Platform arranged to cancel all 9.1 million of Buka's remaining share certificates that were still

in Fiji Islanders' names and to reissue those shares into the names of different Sharp Platform

vehicles, and overnighted to their various brokerage houses.

60.    Each of these batches was accompanied by a check to the transfer agent, drawn on

19

a US Dollar-denominated Canadian bank account of a Sharp Platform back-office vehicle, Celtic Consultants, and having "BUKA" on its memo line, to pay for issuance of the replacement certificate. Each batch was also accompanied by a memorandum, purportedly from the new holder, instructing the transfer agent where to ship the new certificate, and what overnight express company account number to use in making that shipment. That account number, which was the same in every case, belonged to Celtic Consultants.

61.    During this period, Wall frequently exchanged Encrypted Communications with Sharp subordinate Kelln, seeking updates concerning the Sharp Platform's clearance of the remaining Buka shares. Kelln uniformly furnished the requested updates, identifying to Wall the number of shares comprising each grouping, the Q system's 4-character code for the Sharp Platform-supplied front company account at which each grouping of Buka shares had been deposited, how many shares remained to be cleared, and the anticipated timing of their clearance.

62.    Wall ensured that Lee was kept informed of the process of the Buka shares' clearance. For example, Wall copied Lee on two Encrypted Communications he sent to Kelln on May 15, 2013, the first inquiring "what is status of BUKA cleared and being cleared?" and the second, following up on Kelln's response, asking, "[what is] eta on stuff waiting to clear?" Wall also copied Lee on his July 26, 2013 Encrypted Communication to Kelln inquiring, "How many buka are ready and cleared and what is still in paper form;" and Kelln's reply to both, "There are 19,800,000 cleared and ready to trade. There are 200,000 E[scrow, i.e., in the Sharp Platform's possession in certificate form]. There are 26,500,0000 R[estricted]"

63.    As the Sharp Platform, at Wall's behest, continued the process of clearing Buka's remaining shares, Sharp learned that the brokerage firm used by two of the Sharp Platform vehicles at which groupings of Buka shares were to be deposited would not accept the shares

unless Buka's stock had first been the subject of trading at 10 cents or higher per share.  After so

informing Wall (and specifically adding the trade's price could be "higher [than 10 cents] if

needed as part of your strategy [-] Charting etc."), and being assured that Wall would initiate

such a Buka trade, Sharp and Wall had this Encrypted Communications exchange on April 5,

2013:

> Sharp:  u said u would be doing a [Buka] trade of 10 cents [or higher].  When is this
> happening?  The broker wants to route [Buka] to another avenue and we don't
> want that as u said there would be a trade.
>
> Wall:  Just waiting on an audit to be finished I was hoping this week it looks like next
> week.  Will tell you more on Monday, thanks for following up.

Ultimately, Wall arranged for a collusive "trade" of 2,500 Buka shares at 12 cents per share,

which was placed on April 16, 2013, through the Sharp Platform.  This manipulative trade was

recorded as Buka's first-ever trade and served as the basis for allowing the Sharp Platform to

continue clearing Buka's shares for Defendants' benefit.

64.    By early September 2013, 20 million BUKA shares had been allocated among

various Sharp Platform nominee shareholder entities' offshore accounts under the Sharp

Platform's control as follows:

| Nominee Entity Name | # of Shares | % of all Shares | Country | "Q" acct code |
|---|---|---|---|---|
| Argus Equity LLC | 2.25 million | 4.83% | Panama | VERA |
| Tandem Growth LLC | 2.2 million | 4.73% | Switzerland | BSIT |
| Isla Invesco Ltd | 2.1 million | 4.51% | Cyprus | HELI |
| Quezon Group LLC | 2.15 million | 4.62% | Switzerland | VPQU |
| Pegasus Global AG | 2.2 million | 4.73% | Switzerland | BSIP |
| Lornex Financial Ltd | 2.25 million | 4.83% | Panama | VERL |
| Paragon Capital Inc | 2.2 million | 4.73% | Belize | LEPA |
| Mirabeau Compagnie SA | 2.25 million | 4.83% | Belize | LEMI |
| Bartlett Trading Inc | 2.2 million | 4.73% | Panama | VERB |
| Peaceful Lion Holdings Ltd | 0.2 million | 0.43% | Belize | LEPE |
| **TOTAL** | **20 million** | 43.01% | | |

65.    The Buka shares detailed in the above table represented over 43% of Buka's outstanding stock, and fully 100% of Buka's purportedly unrestricted stock.  All of these shares had been issued without restrictive legend.   (Shares issued without restrictive legend are commonly treated by securities brokers and transfer agents as immediately and freely tradeable.)  In reality, however, every last one of these "unrestricted" Buka shares were controlled by Lee, Wall and Kirk, who, by dint of their control of all Buka's shares, were affiliates of the issuer.

66.    An affiliate of an issuer includes "a person that directly, or indirectly through one or more intermediaries, controls" that issuer. 17 C.F.R. § 230.144.

67.    Affiliates of an issuer may not freely trade their securities in that issuer.

68.    Because these shares were controlled by Lee, Wall and Kirk, who together and separately were affiliates of BUKA, as a matter of law, the shares were restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.

69.    By having their Buka shares allocated in multiple different tranches, each of which fell below 5% of Buka's total outstanding shares, to various nominee shareholders furnished by the Sharp Platform, Defendants created the false appearance – deceiving Buka's transfer agent, the nominee entities' brokerage firms, and other market participants – that multiple different, unrelated offshore corporate entities each held less than 5% of Buka's stock.  In reality, those offshore corporate entities were all under common control by the Sharp Platform, which held all of this Buka stock in coordinated fashion for the benefit, and under the direction, of Lee, Wall and Kirk.

70.    Defendants knew the deceptive nature of these less-than-5% allocations, and that adherence to it was necessary to maintain the illusion of disparate, unrelated ownership.  For

example, on June 5, 2013, Kelln sent this Encrypted Communication to Wall: "All we depo[site]d for Buka is clear. There is 200k in Escrow as we don't have anywhere to send it, the [accounts] are at 5% . . . ." (And as noted in ¶ 62 above, Wall contemporaneously kept Lee apprised of these communications.) Earlier, in February of that year, Kelln had explained to Kirk: "The process is: I group certs together that keep the total under 5%. Then I send them in for transfer to the TA [transfer agent]. Once processed the TA fedex's them to the broker. Then we wait for the shares to clear."

71.    Moreover, because Buka's securities had, since 2009, been registered under Section 12 of the Exchange Act, the beneficial-ownership and insider-transactions-reporting provisions of the federal securities laws applied to holders of its securities.

72.    These provisions required beneficial owners of greater than 5% of Buka's common stock to disclose, via a Schedule 13D filing with the Commission, their ownership, as well as any agreements they had entered into concerning the disposition of Buka's securities and, further, to promptly file a 13D amendment whenever their ownership percentage materially changed. These provisions also required greater than 10% beneficial owners of Buka's stock to file a Form 4 with the Commission promptly reporting any change to their ownership, regardless of amount.

73.    Despite being beneficial owners of well over 10% – indeed, fully 100% – of Buka's securities, Defendants never made a single 13D or Form 4 filing with the Commission. Defendants' failure to disclose accurate – indeed, any – information about their beneficial ownership of, trading in, or agreements concerning, Buka's securities, in the face of duties to do so, defrauded investors.

74.    With Buka's shares under their complete control and positioned to be unloaded on

unsuspecting investors, Defendants prepared to dump their stock on retail investors.

75.    To enhance their profits, Defendants first arranged for Buka to merge with a private company that had a business plan which would be appealing to penny stock investors. The vehicle Defendants chose was Nutranomics and, in September 2013 Buka entered into a share exchange agreement with a private company, subsequently changed its name to Nutranomics and started trading under the ticker symbol NNRX.

76.    Defendants oversaw and coordinated the merger as well as its announcement. On April 25, 2013, for example, Wall and Lee had this Encrypted Communications exchange regarding the need for a "project," that is, an operating business that would be a good candidate for a reverse merger and name change:

Wall:   Looking for a project for BUKA pls do the same to see what we can find
Lee:    ok will do.

On August 12, 2013, Wall sent this xPhone message to update Lee: "working on audit/loi [Letter of Intent – related to the Buka merger and name change] etc.. on buka deal." And on August 27, 2013, Lee send this xPhone message to Wall: "Can we do a call … asap, just [to] get an update on where we are with buka."

77.    On September 19, 2013, Wall sent this Encrypted Communication to Sharp, Kelln, and the Sharp Platform's in-house traders stating, "Effective today BUKA's new symbol i[s] NNRX [and its] new name is Nutranomics. There is no restructuring. Please advise brokers or whoever you have to *so we can trade it when we are ready*." (Emphasis added.) The following day, Friday, September 20, 2013, Wall forwarded the above Encrypted Communication to Lee, whose response noted, in part: "promo starting Monday."

78.    The "promo" to which Lee referred was the Nutranomics promotional campaign, which Lee and Kirk had been preparing and which Defendants planned to launch on Monday,

24

September 23, 2013.

79.     Accordingly, Defendants Lee, Wall and Kirk conferred repeatedly in September 2013 to discuss the timing of manipulative trading and the launch of their publicity campaign. As September 23, 2013 approached, Defendants discussed the timing of manipulative trades they intended to make ahead of the promotion's launch.

80.     In a September 20, 2013 Encrypted Communication to Kirk, Lee stated he would "ask G [Geoffrey Wall's] opinion" on this topic, since Lee wanted "to make sure this goes perfectly [because] we got a [expletive] load lined up and sure u boys do too."  After conferring with Wall by phone, Lee had the following Encrypted Communications exchange with Kirk:

> Lee:    So this is [our] consensus[:] if super 8[-K] [i.e., the anticipated public Commission filing by Nutranomics announcing completion of the merger resulting in its name change] comes today [i.e. Friday, September 20] let's do some trades towards close[;] if it doesn't then let's go hard after close and weekend and launch this [expletive] monday.  Agreed?
> Kirk:   Yes agreed
> Lee:    we are checking all the online brokerage to make sure they can trade[;] so far all good.
> Kirk:   awesome.

81.     As of September 19, 2013, the last quoted price for Nutranomics stock was $.12/share, and there had been no reported purchases or sales of shares since the manipulative trade that Wall had arranged on April 16, 2013 (and described at ¶ 63 above), when the stock was listed under the name Buka.

82.     One trading day prior to the Nutranomics promotion launch, Kirk laid out the specifics of these upcoming manipulative trades in Encrypted Communications with Lee, during the trading day on Friday, September 20, 2013:

> Kirk:   it's a good [i]dea to do a trade anyway[; no?] last trade is .12
> Lee:    yeah agreed
> Kirk:   we need it around .80-.85 going into weekend or Monday will look stupid
> Lee:    Gonna do 5k [shares] trade at 75 cents

Kirk:   ok
Lee:    ok 5k trade today at 75 ….

83.     On Friday, September 20, 2013, a Sharp Platform trader ("Sharp Platform Trader #1") acting at Defendants' instruction, coordinated with a U.S. market maker (who also held an xPhone) to execute a 5,000 share trade of Nutranomics stock at $.75 per share.  This was the only trade in the market on September 20, 2013, executed just minutes before the market closed, and it caused Nutranomics' reported share price to increase 525% from the prior day's closing price.  As a result of this single manipulative trade, the starting price for the Lee, Wall and Kirk promotion of Nutranomics was significantly, and fraudulently, inflated.

84.     On September 20, 2013, Nutranomics issued a press release announcing the merger that resulted in its name and ticker symbol change, identifying its new CEO, and claiming that it was "a major player in the [health and wellness] industry and [had] developed over 850 nutritional food and supplement product formulas for some of the world's largest direct marketing companies."

85.     The next week, Nutranomics issued two further press releases touting a supposed business opportunity with the "largest multi-level marketing (MLM) company in the Philippines" and that it was "ready to ship the remaining balance of an outstanding purchase order to one of the world's largest direct marketers of essential oils."

86.     Simultaneously with the aforementioned press releases, and continuing for months, Defendants caused to be disseminated – including via email blasts and Internet landing pages – promotional materials urging investors to buy Nutranomics stock.

87.     Disclaimers in these promotional materials identified a sham company, Nugget Enterprises LLC, as the promotions' purported paying party.

88.    In reality, Kirk had arranged with Sharp to incorporate Nugget in the Caribbean

nation of Saint Kitts and Nevis for Kirk's use, as the following September 24, 2013 Encrypted

Communications exchange reflects:

> Kirk:   we good on that name?
> Sharp: Si.  Confirmed and incorporated yesterday
> Kirk:   Can I get addy [its address]?
> Sharp: Henville Building[,] Charlestown, Nevis
> Kirk:   Confirm names is exactly:  "nugget enterprises llc"
> Sharp: si

Consistently with these Encrypted Communications, the previous day, September 23, 2013,

Kirk's subaccount on the Sharp Platform had been charged $2,900, a charge described in the Q

system as "Nugget Incorp" fees.

89.    Defendants used a website to post their Nutranomics promotions' disclaimers and

to purportedly disclose the amount and source of consideration paid for the promotions.

90.    Defendants' Nutranomics promotions urged their readers to buy the stock and do

so quickly, to capitalize on supposedly realistic prospects of near-term, dramatic gains. An

October 3, 2013 blast email promo, for example, claimed that Nutranomics' stock "is ready to go

up, so time is of the essence here, and we believe the timing is perfect."  Similarly, a November

20, 2013 Nutranomics tout (that identified Nugget Enterprises LLC as its supposed paying party)

prominently characterized Nutranomics as a "***STRONG BUY with*** [a] ***Price Target*** [of] *$4.85*"

per share.  (Emphases, including color, in original).   These statements were misleading as they

omitted to disclose material facts, including that the parties behind these statements did not really

believe them, as evidenced by their simultaneous, and massive, trading in the very opposite

direction, as they unloaded their stock.

91.    The Nutranomics promotions' disclaimers that Defendants caused to be posted

were likewise materially misleading.  These disclaimers stated, for example: "**We reserve the**

27

**right to trade in mentioned securities.** Our employees, contractors, directors, officers, affiliates and associates *may* buy or sell shares before, during or after any alert we may release" (italics added).   In this way, Defendants falsely characterized as merely potential and possible what they, in fact, were already positioned to do (as owners of virtually all the company's stock), fully intended to do and, indeed, were actively doing, i.e., massively unloading their Nutranomics stock.

92.    These disclaimers also falsely purported to identify the dates, amounts and paying party for the Nutranomics promotions.  For example, a November 15, 2013 posting stated:

| Date | Security | Payer | Amount | Receipt |
|------|----------|-------|--------|---------|
| 11/15/2013 | OTCQB: NNRX | Nugget Enterprises LLC | $110,000 | Expected |
| 11/06/2013 | OTCQB: NNRX | Nugget Enterprises LLC | $100,000 | Received |
| 11/01/2013 | OTCQB: NNRX | Nugget Enterprises LLC | $180,000 | Received |
| 10/10/2013 | OTCQB: NNRX | Nugget Enterprises LLC | $120,000 | Received |
| 09/27/2013 | OTCQB: NNRX | Nugget Enterprises LLC | $60,000 | Received |
| 09/20/2013 | OTCQB: NNRX | Nugget Enterprises LLC | $60,000 | Received |
| 09/19/2013 | OTCQB: NNRX | Nugget Enterprises LLC | $35,000 | Received |

93.    The purported paying-party disclosures set forth in ¶ 92 above were likewise false and materially misleading.  Nugget Enterprises was not, in fact, the promotions' paying party but rather a fictitious entity that Defendants procured from the Sharp Platform.  Omitted from the above purported disclosures were the material facts that, among other things, the real paying party for the Nutranomics promotions were Defendants, who controlled all, or virtually all, the company's free trading shares and were therefore affiliates of the Issuer.

94.    Defendants' launch of the Nutranomics promotional campaign was followed by

dramatic rises in demand for Nutranomics stock, at prices in excess of the artificial price of $.75/share that the defendants had set in their manipulative trading.

95.    Defendants took advantage of these price and demand increases.  Between their September 23, 2013 launch of the Nutranomics promotional campaign and the end of December that year, Defendants sold *all 20 million* of their Nutranomics shares to unsuspecting retail investors, for gross proceeds in excess of $16.35 million.  Using his Sharp Platform-issued xPhone, Wall directed most, if not all, of these sales, by sending Encrypted Communications to Sharp Platform Trader #1.

96.    In these Encrypted Communications, Wall demonstrated that he knew exactly which Sharp Platform-administered accounts, at exactly which offshore firms, held Defendants' Nutranomics shares, by specifying which of those accounts, at which of those firms, were to effect which trades, and at what prices, and specifying their 4-character codes (used within the Sharp Platform's encrypted "Q" accounting system) when doing so.

97.    In his Encrypted Communications with Sharp Platform Trader #1, Wall repeatedly sought and received updates on which trades had been executed.  For example, on September 23, 2013, Wall asked Sharp Platform Trader #1, "[c]an we pls have update on nnrx sales, thx."  Sharp Platform Trader #1 responded "sold 5,007,816 so far."

98.    For his part, Lee likewise requested and received updates from Sharp Platform Trader #1 concerning the status of Defendants' Nutranomics stock sales.  For example, in an Encrypted Communication sent on October 11, 2013, Lee requested that Sharp Platform Trader #1 include him in the Nutranomics trading updates to Wall, which Sharp Platform Trader #1 did thereafter.

99.    Wall's Encrypted Communications to Sharp Platform Trader #1 during the course

of the Sharp Platform's dumping, on Defendants' behalf, of their Nutranomics shares, also included occasional instructions by Wall to *buy* Nutranomics stock. These buy orders – which Sharp Platform Trader #1 caused to be executed – were for the manipulative purpose of keeping Nutranomics' stock price from dropping too quickly as Defendants continued to unload it. For example, on September 26, 2013 (the Friday at the end of the first week of the Nutranomics promo campaign), Wall sent two xPhone messages to Sharp Platform Trader #1, within the same minute and before the opening bell, both to buy Nutranomics at $1.23 and to sell the same stock at that "market" price. On that day, Defendants bought a total of 95,000 shares for approximately $127,000 and sold 108,140 shares for approximately $135,000. Since Defendants had millions of extremely low cost-basis Nutranomics stock (having bought all 20 million of these purportedly unrestricted shares from Sharp for just 2½ cents per share), there was no non-manipulative reason for them to buy more Nutranomics stock in the market.

100.    From September 23 through December 16, 2013, as Defendants' Nutranomics stock was being dumped through the Sharp Platform, Wall and Lee used their xPhones to reap the proceeds of these sales through transfers from the Sharp Platform's "NNRX" account into their Sharp Platform subaccounts. The following table lists those Encrypted Communications:

| Date | From | To | Transfer Request Amounts |
|---|---|---|---|
| September 30, 2013 | Lee | Wall, Sharp | $2.5 million to Lee; $2.5 million to Wall |
| October 18, 2013 | Wall | Lee, Gasarch | $500,000 to Lee; $500,000 to Wall |
| November 6, 2013 | Wall | Lee, Gasarch | $75,000 to Lee; $75,000 to Wall |
| November 15, 2013 | Wall | Gasarch, Lee | $550,000 to Lee; $550,000 to Wall |
| November 18, 2013 | Wall | Lee, Gasarch | $150,000 to Lee; $150,000 to Wall |
| November 23, 2013 | Wall | Lee, Gasarch | $575,000 to Lee; $575,000 to Wall |
| November 30, 2013 | Wall | Gasarch, Lee | $225,000 to Lee; $225,000 to Wall |
| December 5, 2013 | Wall | Gasarch, Lee | $1 million to Lee; $1 million to Wall |
| December 7, 2013 | Wall | Gasarch, Lee | $725,000 to Lee; $725,000 to Wall |
| December 10, 2013 | Wall | Gasarch, Lee | $650,000 to Lee; $650,000 to Wall |
| December 18, 2013 | Wall | Gasarch< Lee | $100,000 to Lee; $100,000 to Wall |

101.    In all, Lee's and Wall's respective subaccounts on the Sharp Platform received total distributions, from the Sharp Platform's NNRX account, of approximately $7.9 million and $7.5 million, respectively, in illicit Nutranomics stock sale proceeds.  For his part, Kirk, in turn, received $4.2 million in Nutranomics proceeds from Lee, who used his xPhone to direct the Sharp Platform's operators to make these transfers, in virtually every case shortly after Lee had received his own distribution.  And pursuant to Wall's March 26, 2013 agreement with Sharp (see ¶ 55 above), the Sharp Platform's NNRX account also transferred proceeds from Defendants' illicit sales of Nutranomics shares to pay Sharp the agreed-upon $500,000 for the purchase of the Buka shell.

102.    During Defendants' Nutranomics stock dump, at least 62 investors residing within the District of Massachusetts purchased a total of at least 479,425 shares of Nutranomics stock, and sustained combined losses totaling at least $114,298.

**EXAMPLE TWO:**
**LEE AND WALL'S AMI JAMES STOCK DUMP**

103.    Using methodology similar to that employed with Nutranomics, Lee and Wall used the Sharp Platform (including the encrypted xPhones it supplied and its encrypted "Q" accounting system) to fraudulently unload Ami James stock.  Lee and Wall once again arranged for millions of shares of the Issuer to be reissued in the names of Sharp Vehicles, in tranches of less than five percent of the Issuer's outstanding stock, and deposited with various offshore firms.  In the case of Ami James, while the company was still known as Quorum Corp (ticker QUOR) (Ami James's predecessor), Wall enlisted an associate who was also a Sharp Platform client and xPhone user (the "Associate"), to work with Kelln in getting QUOR's stock so positioned.

104.    On May 28, 2015, after the Associate and Kelln had succeeded in positioning

millions of QUOR shares, in less-than-five-percent tranches, with various Sharp Vehicles'

offshore accounts, the following exchange of Encrypted Communications took place:

| | |
|---|---|
| Kelln: | Not sure I've updated u but the quor dwacs [share allocations to various Sharp Vehicles] have ALL settled now.  Whoot! |
| Associate (ccing Wall): | whoo ty very much!!! |
| Wall (to Associate): | Excellent, and with [Swiss Administrative/Trading Platform #1] also? |
| Associate: | [Yes,] Except for that one position with the new acct with [Swiss Administrative/Trading Platform #1's Head Trader]. That is still pending |

105.    By May 28, 2015, millions of QUOR shares had indeed been cancelled and

reissued, in less-than-five-percent groupings, to various Sharp Platform vehicles, as well as to

several Swiss Administrative/Trading Platform #1-administered vehicles.

106.    The allocations of Quor/Ami James shares to Sharp vehicles were effected

through Sharp Platform directives to the transfer agent, in four separate batches (sent over three

dates – March 31, May 14 and May 27, 2015).  Each batch was accompanied by payment in the

form of a Celtic Consultants check (with "QUOR" on each check's memo line) and instructions

specifying the Sharp Platform vehicle into whose name the shares were to be reissued – just as

had been done in the case of Buka/Nutranomics (see ¶¶ 59-64 above).  The reissued shares,

however, were not overnighted to their destinations (as had been done with Buka/Nutranomics)

but were instead transferred electronically via DWAC (Deposit/Withdrawal at Custodian).  And

as with the post-March 2013 allocations of Buka/Nutranomics shares, these allocations were all

effected at Wall's behest.  (See ¶¶ 61-63 and 103 above).

107.    By the time Lee and Wall launched their promotional campaign for their dump of

Ami James shares, in or about May 2016, they controlled at least 72.7%, and as much as 95.49%,

of Ami James' tradeable shares, including at least 5,059,411 shares held through the Sharp

Platform, and at least another 831,110 shares held through the Swiss Administrative/Trading Platform #1.

108.    Because the securities of Ami James (like those of Buka/Nutranomics before it) had been registered under Section 12 of the Exchange Act, the beneficial-ownership and insider-transactions-reporting provisions of the federal securities laws applied to holders of its securities. Yet, just as Defendants had done in the case of Buka/Nutranomics, Lee and Wall never made a single 13D or Form 4 filing with the Commission concerning Ami James.  Lee's and Wall's failure to disclose accurate – indeed, any – information about their beneficial ownership of, trading in, or agreements concerning, Ami James securities, in the face of duties to do so, defrauded investors.

109.    Lee and Wall utilized Sharp Platform vehicles in their promotion of Ami James. For example, in July 2016, an email service provider in the mass email distribution business ("Blast Email Firm #1"), disseminated email promotions of Ami James, including a July 2016 promotion headlined, "Big News for AJBI." The following month, a Sharp Platform vehicle, Trius Holdings, paid Blast Email Firm #1 $4,655.  According to the Q accounting system, Lee furnished the funds for that payment.  Similarly, in July 2016, another Sharp Platform vehicle, Morris Capital, wired $25,000 to a media company in the penny stock space, which, in turn, promptly forwarded funds to numerous penny stock promotion outlets, including Blast Email Firm #1.  According to Q, Wall funded this wire.

110.    Also consistent with the pattern established in Defendants' prior penny stock dumps, Lee's and Wall's unloading of their Ami James stock took place in the midst of the aforementioned promotional campaign; and the resulting illicit proceeds were distributed (this time from the Sharp Platform's AJBI account) to Lee's and Wall's subaccounts on the Sharp

Platform, with $587,487 going to Wall and $305,857 to Lee.  (Approximately $8,000 of those proceeds were also allocated, from the Sharp Platform's AJBI account, to a subaccount of the Associate who, as noted in ¶¶ 103-104 above, had helped Wall position Ami James' securities for offshore unloading).   In addition, at least $112,500 more in illicit Ami James sales proceeds realized through the Swiss Administrative/Trading Platform #1 were circuitously routed to Lee and Wall, with as much as $20,000 going to Lee and $92,500 to Wall.

111.    During Lee and Wall's Ami James stock dump, at least five investors residing within the District of Massachusetts purchased a total of at least 20,623 shares of Ami James stock, and sustained combined losses totaling at least $6,019.

### DEFENDANTS' UNLOADING OF OTHER PENNY STOCK ISSUERS

112.    In addition to dumping shares of Nutranomics and Ami James, Defendants effected similar dumpings during the course of their fraud scheme, of numerous other penny stocks, including, but not limited to, the following issuers' stocks:    Axiom Corp. (AXMM); Green Innovations, Ltd. (GNIN); Independence Energy Corp. (IDNG) (currently known as RedHawk Holdings Corp.); iTalk Inc. (TALK); Medijane Holdings, Inc. (MJMD), and its predecessor, Mokita Exploration Ltd. (MKIT) (currently known as Phoenix Life Sciences International); Punchline Resources Ltd. (PUNL) also known as Punchline Entertainment, Inc.(currently known as Northern Minerals & Exploration Ltd.); Vapor Hub International, Inc. (VHUB) and its predecessor DogInn, Inc.; and Willow Creek Enterprises Inc (WLOC).

113.    Defendants conducted the dumps of these additional penny stocks similarly to their dumps of Nutranomics and of Ami James, described above.  Among other things, Defendants used an array of Sharp Platform-supplied vehicles to fraudulently spread out and conceal their ownership and control of each Issuer's purportedly unrestricted shares, to unload

those shares upon unsuspecting investors in the midst of promotional campaigns they arranged, and to reap distributions of the resulting illicit proceeds into their Sharp Platform subaccounts, all while flouting their affirmative reporting obligations under the federal securities laws – as controlling shareholders of each  Issuer – to report their holdings and trading.   The following Table provides a non-exhaustive overview of Defendants' scheme:

| ISSUER (TICKER, CIK) | DATE RANGE OF STOCK SALES | ESTIMATED ILLICIT PROFIT | COMPLICIT DEFENDANTS |
|---|---|---|---|
| AJBI (0001557565) | 2/25/2016 – 12/19/2016 | $1,007,507 | Lee & Wall |
| NNRX (0001451433) | 9/23/2013 – 1/7/2014 | $15,209,840 | Lee, Wall & Kirk |
| GNIN (0001491471) | 12/17/2012 – 9/12/2013 | $19,463,892 | Lee, Wall & Kirk |
| TALK (001373444) | 4/26/2013 – 9/11/2013 | $13,585,222 | Lee, Wall & Kirk |
| IDNG (0001353406) | 2/24/2012 – 3/22/2013 | $8,868,592 | Lee, Wall & Kirk |
| AXMM (0001566265) | 3/5/2015 – 6/29/2015 | $4,390,900 | Lee, Wall & Kirk |
| WLOC (0001415952) | 9/17/2010 – 4/19/2012 | $6,777,574 | Lee, & Wall |
| VHUB (0001515718) | 3/7/2014 – 11/4/2014 | $4,508,690 | Lee, Wall & Kirk |
| PUNL (0001415744) | 8/16/2012 – 5/30/2013 | $1,743,723 | Lee, Wall & Kirk |
| MJMD (0001493212) | 3/10/2014 – 4/14/2015 | $1,793,059 | Lee & Wall |
| Totals | | $77,348,999 | |

114.    During each of the penny stock dumps listed in the above table, purchasers of each of the stocks listed therein, on information and belief, included investors residing within the District of Massachusetts, who sustained substantial losses.

## FIRST CLAIM FOR RELIEF
## <u>FRAUD IN THE OFFER OR SALE OF SECURITIES</u>

**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Lee, Wall, and Kirk)**

115.    Paragraphs 1 through 114 above are re-alleged and incorporated by reference as if fully set forth herein.

116.    By reason of the conduct described above, defendants Lee, Wall, and Kirk, acting knowingly, recklessly and negligently, in the offer or sale of securities of one or more of Nutranomics, Ami James, Green Innovations, iTalk, Independence Energy, Axiom, Medijane, Willow Creek, Vapor Hub and Punchline, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

117.    By reason of the conduct described above, defendants Lee, Wall, and Kirk violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless restrained and enjoined.

## SECOND CLAIM FOR RELIEF
## <u>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</u>

**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Lee, Wall, and Kirk)**

118.    Paragraphs 1 through 114 above are re-alleged and incorporated by reference as if fully set forth herein.

119.    By reason of the conduct described above, defendants Lee, Wall, and Kirk, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of securities of one or more of Nutranomics, Ami James, Green Innovations, iTalk, Independence

Energy, Axiom, Medijane, Willow Creek, Vapor Hub and Punchline, by the use of the means or

instrumentalities of interstate commerce or of the mails, or of any facility of any national

securities exchange:

      a.   employed devices, schemes, or artifices to defraud;

      b.   made untrue statements of material facts or omitted to state material facts

           necessary to make the statements made, in the light of the circumstances

           under which they were made, not misleading; or

      c.   engaged in acts, practices, or courses of business which operated or would

           have operated as a fraud or deceit upon any person.

    120.    By engaging in the foregoing conduct, Defendants Lee, Wall and Kirk, violated,

and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5)

### THIRD CLAIM FOR RELIEF
### <u>UNREGISTERED OFFERINGS OF SECURITIES</u>

**(Violations of Sections 5(a) and 5(c) of the Securities Act by Lee, Wall and Kirk)**

    121.    Paragraphs 1 through 114 above are re-alleged and incorporated by reference as if

fully set forth herein.

    122.    At all relevant times, the securities of one or more of Nutranomics, Ami James,

Green Innovations, iTalk, Independence Energy, Axiom, Medijane, Willow Creek, Vapor Hub

and Punchline referenced above as having been sold by Lee and Wall, and/or by Lee, Wall and

Kirk, were not registered in accordance with the provisions of the Securities Act and no

exemption from registration was available.

    123.    Defendants Lee, Wall and Kirk's offers and sales of the securities of one or more

of Nutranomics, Ami James, Green Innovations, iTalk, Independence Energy, Axiom, Medijane,

Willow Creek, Vapor Hub and Punchline were made in the United States in that: (a) sales were executed by broker-dealer firms in the United States; (b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with respect to the sales passed in the United States.

124.    By reason of the foregoing, defendants Lee, Wall, and Kirk, directly or indirectly, made use of the means and instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was available.

125.    By reason of the foregoing, defendants Lee, Wall, and Kirk violated and, unless restrained and enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Judgement that:

A.      Permanently retrains and enjoins the defendants Lee, Wall, and Kirk, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from:

1.      violating Section 17(a) of the Securities Act [15 U.S.C. §§77q(a)];

2.      violating Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

3.      Violating Section 5 of the Securities Act [15 U.S.C. § 77e); and

4.    directly or indirectly, including but not limited to, through any entity each

owns or controls, participating in the issuance, purchase, offer, or sale of

any security; provided, however, that such injunction shall not prevent

defendants from purchasing or selling securities listed on a national

securities exchange for their own personal account;

B.    Permanently bars Defendants Lee, Wall and Kirk from participating in an offering

of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of

the Exchange Act [15 U.S.C. § 78u(d)];

C.    Orders the defendants to pay civil monetary penalties pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)];

D.    Orders Defendants Lee, Wall and Kirk, to disgorge, with prejudgment interest,

any and all ill-gotten gains each received as a result of the conduct described herein;

E.    Retains jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

F.    Grants such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

The Commission demands a jury in this matter for all claims so triable.


DATED this 9th day of December, 2021.


          Respectfully submitted,


          <u>/s/ J. Lee Buck, II</u>
          J. Lee Buck, II (D.C. Bar No. 421878)
          James E. Smith (D.C. Bar No. 482985)
          Steven Susswein (D.C. Bar No. 473624)
          Edward B. Gerard (CA Bar No. 248053)
          SECURITIES AND EXCHANGE COMMISSION
          100 F Street N.E.
          Washington, DC  20549
          Phone: (202) 551-4598 (Buck direct)
          Phone: (202) 551-5881 (Smith direct)
          Fax: (202) 772-9282(fax)
          buckjl@sec.gov
          smithja@sec.gov