## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-11997-JEK |
| | ) | |
| JAY SCOTT KIRK LEE, GEOFFREY ALLEN WALL, and BENJAMIN THOMPSON KIRK, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM AND ORDER ON DEFENDANT BENJAMIN THOMPSON KIRK'S MOTION TO DISMISS

**KOBICK, J.**

The Securities and Exchange Commission ("SEC") brought this enforcement action against defendants Jay Lee, Geoffrey Wall, and Benajmin Kirk in December 2021. The complaint alleges that the defendants violated federal securities laws by engaging in fraud and making unregistered offerings of securities. Pending before the Court is Kirk's recent motion to dismiss the complaint for insufficient service of process and for failure to state a claim. That motion will be denied because the SEC properly served Kirk, adequately states fraud claims that satisfy the requisite heightened pleading standard, plausibly alleges that he failed to register securities, and plausibly asserts timely claims for civil penalties and disgorgement for non-scienter-based violations.

### BACKGROUND

The following facts, drawn from the complaint, are accepted as true for purposes of Kirk's motion to dismiss.

Kirk is a Canadian citizen who, around September 2010, joined an offshore platform run by Frederick Sharp. ECF 1, ¶¶ 2, 16, 40. This platform offered accounting services, provided encrypted communication, and supplied offshore front companies that allowed users to conceal their ownership and control over those companies. *Id.* ¶¶ 4, 6-8, 33. Kirk started working with codefendants Lee and Wall on the Sharp platform in May 2022 to commit pump-and-dump schemes of penny stocks. *Id.* ¶ 41. In such a scheme, fraudsters "sell their inflated shares to someone else, who ultimately gets stuck with an empty bag of goods." *SEC v. Gasarch*, 168 F.4th 11, 54 (1st Cir. 2026). The term "penny stocks" refers to shares in a small company that usually trade at less than $5 per share and are therefore "notoriously volatile and risky." *Id.* at 24 n.1; *see* ECF 1, ¶ 25.

Kirk primarily served as a promoter of the penny stocks on the "pumping" side of the scheme, rather than as an orchestrator of the trades on the "dumping" side. ECF 1, ¶¶ 16, 42, 57. Yet he was aware of how the scheme worked. *Id.* ¶¶ 52-54, 57, 70. In February 2023, Courtney Kelln, who helped operate the Sharp platform, explained to him that she creates several offshore nominee entities that each own less than 5% of the total shares in a shell company, in order to give the illusion that those entities are unrelated companies when, in reality, they are all owned by the Sharp platform. *Id.* The 5% threshold is important because "any person who owns or acquires a beneficial ownership of more than five percent of any class of equity securities registered under the Exchange Act [must] file ownership reports with the SEC on a Schedule 13D." *Tax-Free Fixed Income Fund for Puerto Rico Residents, Inc. v. Ocean Cap. LLC*, 137 F.4th 6, 18 (1st Cir. 2025) (citing 15 U.S.C. § 78m); *see* ECF 1, ¶ 20.

On March 28, 2013, through an encrypted message on the Sharp platform, Wall and Lee invited Kirk to participate in a stock fraud scheme for Nutranomics, Inc., formerly known as Buka

Ventures, Inc. ECF 1, ¶¶ 52, 57. By early September 2013, all of Buka's purportedly unrestricted stock was allocated among several offshore nominee entities, each of which held less than 5% of the total shares, and each of which was controlled by Kirk, Lee, Wall, and the Sharp platform. *Id.* ¶¶ 64-65, 68-69. This allocation, the SEC alleges, purposefully created the false impression that these entities were distinct and unrelated. *Id.* ¶¶ 69-70. Because the defendants had complete control over the nominee entities, they were required, among other things, to file a Schedule 13D and Form 4 with the SEC, but failed to do so. *Id.* ¶¶ 71-73. The defendants' failure to file these forms, the SEC alleges, allowed them to defraud other investors in Buka by suggesting, falsely, that multiple investors were independently interested in the company.

The defendants merged Buka with a private company, Nutranomics, and started trading under the ticker symbol NNRX later in September 2013. *Id.* ¶¶ 75-76. Also that month, Kirk, Lee, and Wall repeatedly discussed when to launch the Nutranomics promotional campaign and begin trading. *Id.* ¶ 79. Kirk agreed on Friday, September 20, 2013 to start the campaign the following Monday, September 23. *Id.* ¶¶ 78, 80. That Friday, the defendants issued a press release portraying Nutranomics as "a major player in the [health and wellness] industry," and they directed another Sharp platform trader to coordinate a 5,000-share trade of Nutranomics stock in order to artificially inflate the share price 525% over the prior day's closing price. *Id.* ¶¶ 82-84. The following week, Nutranomics distributed two additional press releases touting its business potential. *Id.* ¶ 85. The defendants also urged investors to buy Nutranomics stock by sending promotional materials through email blasts and by posting them online. *Id.* ¶¶ 86, 89-90.

On Tuesday, September 24, 2013, Kirk coordinated with Sharp to incorporate Nugget Enterprises LLC in Saint Kitts and, throughout the week, identified that sham company as the paying party for Nutranomics' promotions. *Id.* ¶¶ 87-88. For instance, a posting from November

2013 falsely stated that Nugget Enterprises had purchased Nutranomics stock seven times, for between $35,000 and $180,000, from September 19, 2013 through November 15, 2013. *Id.* ¶¶ 92-93. Another promo that month similarly identified Nugget Enterprises and claimed that Nutranomics' stock was a "STRONG BUY with [a] Price Target [of] $4.85." *Id.* ¶ 90 (emphases altered). These materials were misleading, the SEC alleges, because the defendants, who continued to unload their Nutranomics stock, failed to disclose that Nugget Enterprises was a fictious paying party that they controlled. *Id.* ¶¶ 90-91, 93.

The "pumping" promotional campaign proved successful, as Nutranomics' share price exceeded the defendants' goal. *Id.* ¶ 94. Between September and December 2013, the defendants "dumped" or sold all of their 20 million shares in Nutranomics to unsuspecting retail investors, earning $16.35 million in gross proceeds. *Id.* ¶ 95. For his part in the scheme, Kirk received $4.2 million through his account on the Sharp platform. *Id.* ¶¶ 46, 101. Over 60 investors in Massachusetts, on the other hand, lost a combined total of at least $114,298 after collectively purchasing nearly 480,000 shares of Nutranomics stock. *Id.* ¶ 102.[1]

The SEC filed this enforcement action in December 2021. ECF 1. Against all three defendants, the complaint asserts claims of fraud in the offer or sale of securities, in violation of Sections 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and (a)(3) (Count I); fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c) (Count II); and unregistered offerings of securities, in violation of Sections 5(a) and (c) of the

---

[1] The complaint alleges that Kirk was involved in other pump-and-dump schemes between 2012 and 2015. ECF 1, ¶¶ 112-14. But in light of this Court's prior determination that these allegations are "insufficient to meet the particularity standard required by Federal Rule of Civil Procedure 9(b)," ECF 24, the Court does not rely further on the other allegations concerning Kirk at paragraphs 112 through 114 of the complaint.

Securities Act, 15 U.S.C. §§ 77e(a) and (c) (Count III). *Id.* ¶¶ 115-25. In March 2023, the Court granted the SEC's motion for alternative service, allowing the SEC to, as relevant here, serve Kirk by email. ECF 25.

This case was stayed to permit settlement discussions between the SEC and Wall in July 2024, October 2024, July 2025, October 2025, and again in December 2025. ECF 48, 51, 60, 62, 66.[2] The stay was lifted in February 2026, after Kirk moved to dismiss the complaint for insufficient service of process and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6), respectively. ECF 72, 76. The SEC opposed that motion the same month, and Kirk filed his reply in March 2026. ECF 78, 79. The Court held a hearing and took the motion under advisement in June 2026. ECF 88.

**DISCUSSION**

**I.      Service of Process.**

Kirk first moves to dismiss the complaint for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5). Since Kirk "challenges the adequacy of service," the SEC bears "the burden of showing that service was proper." *Vázquez-Robles v. CommoLoCo, Inc.*, 757 F.3d 1, 4 (1st Cir. 2014). It has met that burden.

In March 2023, after the SEC attempted six times, unsuccessfully, to serve Kirk in Canada through the Hague Convention, the Court permitted alternative service by email at three email addresses under Federal Rule of Civil Procedure 4(f)(3). ECF 25; *see* ECF 23, at 4. Such service "pass[ed] constitutional muster," the Court explained, because Kirk "would likely receive the summons and complaint" at those email addresses given evidence showing that he had used the

---

[2] Upon agreement between the SEC and Wall, the Court entered final judgment as to Wall in April 2026. ECF 83, 84.

5

addresses before. ECF 25 (quotation marks omitted). SEC Attorney James Smith filed a proof of service in November 2025 attesting that he had served Kirk via email at bkirk90@hotmail.com, among other approved addresses, on April 5, 2023. ECF 63, at 2. That proof of service "generally serves as *prima facie evidence* that service was validly performed." *Blair v. City of Worcester*, 522 F.3d 105, 111 (1st Cir. 2008).

Kirk fails to proffer "sufficient rebuttal evidence to refute [that] presumption of valid service." *Id.* at 111-12. In his declaration, Kirk avers that he "never received notice" that he had been served at any of the email addresses authorized by the Court because he "stopped accessing and using" them, including bkirk90@hotmail.com. ECF 73-1, ¶¶ 10, 14. But the Due Process Clause does not "requir[e] actual notice"; instead, "it requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action." *Dusenbery v. United States*, 534 U.S. 161, 170-71 (2002) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). This Court—in an order issued by Judge Kelley before the case was reassigned— has already determined that email service would comport with due process because "Kirk would likely receive the summons and complaint" at the identified email addresses. ECF 25. Under the law of the case doctrine, this holding is ordinarily binding on "a successor trial judge who steps in to complete a pending case" and "ought to [be] respect[ed] and follow[ed]." *United States v. Robertson*, 162 F.4th 209, 233 (1st Cir. 2025) (quotation marks omitted).

Nevertheless, even if the Court were not to apply the law of the case doctrine, the undersigned agrees with Judge Kelley's prior determination that the SEC's email service was reasonably calculated to provide Kirk with notice of this action notwithstanding the age of his email addresses. *See AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 420, 428-29 (1st Cir. 2015) (citing *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002) as "affirming

court-ordered alternative service methods on a foreign business, including service via email").

Kirk contends that the SEC failed to verify that the three authorized email addresses were active.

Counsel for the SEC avers, however, that the SEC did not receive a delivery failure notice from

bkirk90@hotmail.com when he emailed Kirk the summons and complaint in April 2023. ECF 78-

1, ¶¶ 8, 11. Kirk's counsel, Steven Feldman, similarly attests that he sent a test email to that address

in December 2022 and received a response that "[d]elivery to these recipients or groups is

complete, but no delivery notification was sent by the destination server." ECF 73-2, ¶ 15. While

Attorney Feldman questions whether Kirk actually received his email, actual notice is not required.

Due process is satisfied where, as here, "it was reasonably calculated to reach the intended

recipient when sent." *Jones v. Flowers*, 547 U.S. 220, 226 (2006); *see SEC v. Taller*, No. 25-cv-

3537-JHR-RFT, 2025 WL 1864882, at *4 (S.D.N.Y. July 7, 2025) (due process met where the

SEC "did not receive a non-delivery bounce back message").[3] Because the SEC properly served

Kirk and its email service comported with due process, his Rule 12(b)(5) motion must be denied.

## II.    Heightened Pleading Standard Under Rule 9(b).

Kirk next moves to dismiss Counts I and II for failure to satisfy the heightened pleading

standard of Federal Rule of Civil Procedure 9(b). Such "scheme liability claims" alleging

violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as well as Section 10(b) of the

Exchange Act and Rule 10b-5, typically involve those "who disseminate false or misleading

statements to potential investors with intent to defraud." *Lorenzo v. SEC*, 587 U.S. 71, 74, 79

---

[3] Kirk posits that the SEC's December 2022 motion for alternative service improperly stated that his email addresses were "discovered through its investigation of *this* matter," without disclosing that those addresses came from its separate 2013 investigation of him and were thus, in his view, stale. ECF 23, at 5-6 (emphasis added). But counsel for the SEC clarified in a supporting declaration, which Judge Kelley cited in granting the motion, that the email addresses were revealed in a 2013 enforcement action. ECF 23-4, ¶ 8; ECF 25 (citing, *inter alia*, *id.*).

(2019); *see Zhou v. Desktop Metal, Inc.*, 120 F.4th 278, 289 (1st Cir. 2024). Under Rule 9(b), which the parties agree applies to these claims, "a party alleging fraud 'must state with particularity the circumstances constituting fraud' in the pleading, but '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Hill v. Gozani*, 638 F.3d 40, 55 (1st Cir. 2011) (quoting Fed. R. Civ. P. 9(b)).

Pursuant to Sections 17(a)(1) and (a)(3) of the Securities Act, it is "unlawful for any person in the offer or sale of any securities . . . directly or indirectly . . . to employ any device, scheme, or artifice to defraud" or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. §§ 77q(a)(1) and (a)(3). Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). These statutory terms "sound expansive" precisely because Congress intended to define fraud in the offer or sale of securities broadly. *Gasarch*, 168 F.4th at 24 (citing *United States v. Naftalin*, 441 U.S. 768, 773 (1979)). Rule 10b-5 likewise declares it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. §§ 240.10b-5(a) and (c); *see SEC v. Tambone*, 597 F.3d 436, 444 (1st Cir. 2010) ("the phrasing of Rule 10b-5 largely mirrors the language of section 17(a)"). "Rule 10b-5 'is coextensive with the coverage of [Section] 10(b).'" *Ponsa-Rabell v. Santander Sec. LLC*, 35 F.4th 26, 32 (1st Cir. 2022) (quoting *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002)).

The parties agree that to state a scheme liability claim under Sections 17(a)(1) and (a)(3) of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5, the SEC must allege that Kirk "committed a deceptive or manipulative act . . . in furtherance of the alleged scheme to defraud." *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023) (quoting *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)). They also agree that the SEC needs to "specify what deceptive or manipulative acts were performed [by Kirk] . . . , when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters*, 11 F.4th at 105 (quotation marks omitted). Kirk contends that the SEC must additionally allege scienter, which "requires a showing of either conscious intent to defraud or a high degree of recklessness." *SEC v. Lemelson*, 57 F.4th 17, 28 (1st Cir. 2023) (quotation marks omitted). But while Section 17(a)(1), Section 10(b), and Rule 10b-5 require scienter, negligence is sufficient for purposes of Section 17(a)(3). *See SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008). And unlike the usual plaintiff, the SEC need not, as Kirk further argues, "plead facts sufficient to create a *strong inference* that [he] acted with scienter." *SEC v. Papa*, 555 F.3d 31, 35 n.1 (1st Cir. 2009) (emphasis added).

The SEC alleges that Kirk committed deceptive acts in furtherance of the Nutranomics penny stock scheme by incorporating Nugget Enterprises and falsely portraying it in promotional materials as a buyer of Nutranomics stock and a paying party for Nutranomics' promotions, without disclosing that it was controlled by the defendants who were simultaneously unloading their stock. ECF 1, ¶¶ 87-93. The complaint specifies that these acts occurred between September 2013 and November 2013. *Id.* ¶¶ 88, 90, 92. The complaint also describes the detrimental effect of the promotional campaign: It led the Nutranomics stock to rise as investors purchased shares, but because Wall and Lee were simultaneously dumping their shares in the company,

9

Massachusetts investors lost at least $114,298. *Id.* ¶¶ 94, 100-02. Finally, as pled, Kirk was aware of, and knowingly participated in, the pump-and-dump scheme. He messaged Lee in March 2013 to confirm that Buka would be the "next" dump and had learned from Kelln the month before about the importance of keeping front companies below the 5% ownership threshold. *Id.* ¶¶ 57, 70. In encrypted communications with Lee on the Sharp platform in September 2013, Kirk "agreed" to begin promoting the Nutranomics stock and discussed what the share price should be for that stock. *Id.* ¶¶ 80, 82. And Kirk earned $4.2 million in Nutranomics proceeds. *Id.* ¶ 101.

These allegations are sufficient to make out viable scheme liability claims under Sections 17(a)(1) and (a)(3) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. *See SEC v. Sharp*, 626 F. Supp. 3d 345, 367  (D. Mass. 2022) (denying motion to dismiss such claims against defendant who was allegedly paid "to promote stock that the Veldhuis Control Group was looking to dump" and to conceal its control over that stock); *SEC v. Stubos*, 634 F. Supp. 3d 174, 201 (S.D.N.Y. 2022) (same where defendant allegedly "used the Sharp Group and various nominee companies to conceal his majority ownership of Petrosonic and Ener-Core shares, broke those [shares] into blocks of less than 5% to avoid market scrutiny," and paid promoters to make misleading disclosures about share purchase by those companies); *see also Gasarch*, 168 F.4th at 35-37 (affirming defendant's liability under these provisions post-trial where he "direct[ed] the transfer of funds from the nominee account to the true beneficial owners of the stock," "whose ownership was impermissibly concealed," and "pa[id] stock promoters"); *SEC v. DeFrancesco*, 699 F. Supp. 3d 228, 242 (S.D.N.Y. 2023) (denying summary judgment for defendants on these claims given "evidence of a pump-and-dump scheme that [they] contributed to by assisting with the fraudulent promotional articles that caused Cool's stock price to artificially skyrocket").

Kirk's efforts to resist this conclusion are unpersuasive. The SEC does not, as Kirk contends, rely on collective allegations against the "Defendants" without distinguishing among them. While Kirk is correct that the complaint lacks allegations that he specifically executed manipulative stock trades, he is nonetheless liable for his own deceptive acts in incorporating Nugget Enterprises and promoting that entity as a paying party and purchaser of Nutranomics stock, while concealing from investors that the defendants held significant Nutranomics shares. ECF 1, ¶¶ 87-93. As this Court has explained, a defendant may be liable under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 where, as here, he "participat[ed] in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors." *SEC v. Durgarian*, 477 F. Supp. 2d 342, 352, 355 (D. Mass. 2007) (quotation marks omitted), *aff'd sub nom. Papa*, 555 F.3d 31. Kirk further contends that the SEC's allegations of merely "routine promotional activity and coordinated communications" fail to satisfy the scienter requirement. ECF 79, at 11. This contention mischaracterizes the complaint. Kirk's alleged communications on the Sharp platform, as discussed, support the plausible interference that he was aware of, and knowingly participated in, the Nutranomics pump-and-dump scheme. *See Sharp*, 626 F. Supp. 3d at 391-93 (finding scienter satisfied based in part on similar alleged encrypted communications on that platform). Counts I and II therefore survive dismissal.

### III.   Plausibility of Section 5 Claim.

Kirk further moves to dismiss Count III under Federal Rule of Civil Procedure 12(b)(6). In evaluating a Rule 12(b)(6) motion to dismiss, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41

11

(1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

Count III asserts that Kirk violated Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), by failing to register the penny stock sales. Those Sections make it "unlawful for any person, directly or indirectly," to use the "instruments of transportation or communication in interstate commerce or of the mails to sell" securities "unless a registration statement has been filed" with the SEC or "is in effect" as to those securities. 15 U.S.C. §§ 77e(a), (c). "This registration requirement 'protect[s] investors by promoting full disclosure of information thought necessary to informed investment decisions.'" *United States v. Weed*, 873 F.3d 68, 71 (1st Cir. 2017) (quoting *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953)). The parties agree that, to establish a prima facie case for a Section 5 violation, the SEC must plausibly allege that "(1) no registration statement was in effect as to the securities, (2) [Kirk] sold or offered to sell [those] securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *SEC v. GenAudio Inc.*, 32 F.4th 902, 939 (10th Cir. 2022) (quotation marks omitted); *see SEC v. Sargent*, 129 F.4th 1, 10 (1st Cir. 2025) (citing *id.* at 941); *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 280 (D. Mass. 2015).

Kirk does not contest the first or third elements, which are satisfied by the complaint's allegations that the securities sold by the defendants were unregistered, and that Kirk used the Sharp platform to send encrypted communications to promote the sale of those securities. ECF 1,

12

¶¶ 4, 7, 42, 68, 82, 88, 101, 122, 124; *see Sharp*, 626 F. Supp. 3d at 396-97 (finding the first and third elements satisfied where plaintiff alleged that "hundreds of securities that were sold as part of this scheme were not registered" and defendants "communicated via encrypted messaging platforms"). Kirk instead contends that the second element has not been met. It is undisputed that the SEC may satisfy this element by alleging that Kirk "was a 'necessary participant' or 'substantial factor' in the scheme to sell unregistered securities." *SEC v. Morrone*, 997 F.3d 52, 62 (1st Cir. 2021); *see SEC v. Jones*, 300 F. Supp. 3d 312, 315 (D. Mass. 2018).

The SEC plausibly alleges that Kirk indirectly sold Nutranomics shares as a substantial participant in the defendants' pump-and-dump scheme. The First Circuit has held a defendant liable under Section 5 for "participating in the offer or sale of unregistered securities in interstate commerce or through the mails" where "he provided free advertising for . . . the investment funds on his website" and offered the company serving those funds "free access to his investment newsletter subscriber lists for use in promoting the funds." *SEC v. Saxena*, 26 F. App'x 22, 23 (1st Cir. 2001) (per curiam). Here, too, Kirk allegedly "assisted with promotional campaigns concerning the various issuers' stocks." ECF 1, ¶ 16. For example, as the SEC alleges, he promoted Nutranomics shares with full knowledge of the defendants' upcoming manipulative trading by helping incorporate Nugget Enterprises and using that sham company as a fictious paying party in promotional email blasts and online content that urged investors to quickly purchase Nutranomics stock. *Id.* ¶¶ 78-93. In addition, Kirk helped direct another Sharp platform trader to coordinate a trade of 5,000 shares of Nutranomics stock in a way that artificially inflated the stock price shortly before the deceptive promotional campaign. *Id.* ¶¶ 82-83. For his role in that penny stock fraud scheme alone, Kirk allegedly earned $4.2 million out of the total estimated illegal profit of approximately $15.2 million. *Id.* ¶¶ 101, 113.

Kirk protests that his alleged receipt of $4.2 million does not render him a necessary participant. But, as pled, he did not simply receive those funds as a passive observer. *See Jones*, 300 F. Supp. 3d at 316 n.7 ("The passive receipt of commission payments from her brother is, by itself, insufficient as a matter of law to support an inference that [defendant] was 'a necessary or substantial participant' in the ongoing scheme."); *see also SEC v. Sargent*, 589 F. Supp. 3d 173, 191, 197 n.17 (D. Mass. 2022) (finding Section 5 prima facie violation and noting that "most courts have held that" whether a defendant was "a substantial and necessary participant in the transaction" "is matter of fact for the jury to decide"), *aff'd*, 129 F.4th 1. Instead, he allegedly played an active role in advancing the Nutranomics scheme as a promoter of that stock. *See SEC v. Dalius*, No. 18-cv-08497-FWS-E, 2023 WL 3988425, at *11 (C.D. Cal. May 24, 2023) (second element satisfied at summary judgment where evidence showed that defendant "promoted sales of the [contested] Memberships through video promotions, online events, and in-person meetings"); *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1308 (S.D. Fla. 2012) (same where defendant "orchestrated the false media campaign to inflate interest in the purchase of [the disputed] shares"). Because the SEC has stated a plausible Section 5 violation, Count III will not be dismissed.

## IV.    Statute of Limitations.

Also invoking Rule 12(b)(6), Kirk seeks dismissal of the SEC's claims for civil penalties and disgorgement for non-scienter-based violations as barred by the five-year statute of limitations. For the Court to dismiss these claims, Kirk's statute of limitations defense must be "clear on the face of the [SEC's] pleadings," *Santana-Castro v. Toledo-Dávila*, 579 F.3d 109, 113-14 (1st Cir. 2009) (quotation marks omitted), such that the SEC's allegations "leave no doubt" that the claims are time barred, *Dagi v. Delta Airlines, Inc.*, 961 F.3d 22, 27 (1st Cir. 2020) (quotation marks omitted).

14

In Kirk's view, the claims are untimely because his alleged misconduct occurred in 2013 and this complaint was filed in 2021, more than five years later. Kirk is correct that, ordinarily, claims for civil penalties and non-scienter-based violations are subject to a five-year statute of limitations set forth in 28 U.S.C. § 2462 and 15 U.S.C. § 78u(d)(8)(A)(i). Both statutes, however, contain an exception to that limitations period where the defendant is outside of the United States.

Under section 2462, an action for civil penalties "shall not be entertained *unless commenced within five years* from the date when the claim first accrued *if, within the same period, the offender* or the property *is found within the United States* in order that proper service may be made thereon." 28 U.S.C. § 2462 (emphases added). The plain text of that provision makes clear that the five-year limitations period does not begin to run until the defendant is present in the United States. District courts, including this one, have widely read section 2462 to mean just that. *See Sharp*, 626 F. Supp. 3d at 386 (collecting cases); *accord SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 58 (D.D.C. 2024). The Eleventh Circuit has similarly observed that "section 2462 provides an exception to its five-year limit: when the offender or property is not 'found within the United States.'" *SEC v. Revolutionary Concepts, Inc.*, No. 21-10984, 2022 WL 386085, at *7 (11th Cir. Feb. 9, 2022). Kirk cites no case law to the contrary.[4] He does contend, as policy matter, that this interpretation would improperly eliminate the statute of limitations for foreign defendants. But in 1839 when Congress added the language "if found within the United States," courts at the time, including this one, "understood that the statute of limitations would not begin to run while defendants were outside of the United States and, therefore, not amenable to service." *SEC v.*

---

[4] Kirk relies on two Supreme Court cases, but neither case addressed the statutory language requiring that the defendant be "found within the United States." 28 U.S.C. § 2462; *see Kokesh v. SEC*, 581 U.S. 455 (2017); *Gabelli v. SEC*, 568 U.S. 442 (2013). Nor does the Supreme Court's recent decision in *Sripetch v. SEC*, 146 S. Ct. 1403 (2026), address that language.

15

*Straub*, 921 F. Supp. 2d 244, 261 (S.D.N.Y. 2013) (citing *United States v. Brown*, 24 F.Cas. 1263, 1264 (D. Mass. 1873)). Congress repeatedly recodified this same language, and the Court's role here is to interpret, not amend, section 2462. *Id.*

Under section 78u, a disgorgement claim may similarly be brought "not later than 5 years after the latest date of the violation that gives rise to the action or proceeding in which the [SEC] seeks the claim occurs." 15 U.S.C. § 78u(d)(8)(A)(i). When "calculating [the] limitations period" for such a claim, "any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that period." *Id.* § 78u(d)(8)(C). The "date of accrual" is "the day on which the limitations clock begins to click." *Carreras-Rosa v. Alves-Cruz*, 127 F.3d 172, 174-75 (1st Cir. 1997) (quotation marks omitted). Under this statute, the applicable five-year limitations period does not start ticking until the defendant is within the United States. *See Sharp*, 626 F. Supp. 3d at 386; *Binance Holdings*, 738 F. Supp. 3d at 58.

In light of these statutory exceptions to the five-year limitations period, the complaint cannot be said to "leave no doubt" that the SEC's claims for civil penalties and disgorgement for non-scienter-based violations are time barred. *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998). As pled, Kirk "is a Canadian citizen believed to be currently residing in Hope, British Columbia, Canada." ECF 1, ¶ 16. He allegedly helped his codefendants fraudulently promote various penny stocks between 2012 and 2016 but primarily in 2013. *Id.* ¶¶ 2, 16, 41-42, 83. It is unclear from the complaint whether Kirk engaged in that illicit conduct from Canada or the United States.[5] If Kirk were not "found within the United States" during this period, the five-

---

[5] The SEC highlights Kirk's declaration, in which he attests under penalty of perjury that he is "a citizen of Cananda" and "was located outside the United States" "[a]t all relevant times" for the

year statute of limitations would be inapplicable to the civil penalties claims against him. 28 U.S.C. § 2462. The limitations period on the SEC's non-scienter-based disgorgement claims would likewise not have begun to run if he had always been "outside of the United States." 15 U.S.C. § 78u(d)(8)(C).

Kirk further contends that the SEC failed to allege that its claims were tolled while he was outside of the United States. The Supreme Court has made clear, however, that "an 'affirmative defense' is 'not something the plaintiff must anticipate and negate in her pleading.'" *Cunningham v. Cornell Univ.*, 604 U.S. 693, 702 (2025) (quoting *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 n.9 (2017)). Because the facts establishing Kirk's statute of limitations defense are not "clear on the face of the [SEC's] pleadings," its claims for civil penalties and disgorgement for non-scienter-based violations are not subject to dismissal at this stage. *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (quotation marks omitted).

## CONCLUSION AND ORDER

For the foregoing reasons, Kirk's motion to dismiss the complaint, ECF 72, is DENIED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: August 10, 2026                          UNITED STATES DISTRICT JUDGE

---

case. ECF 73-1, ¶¶ 2, 4. Unlike the complaint, however, this declaration cannot be considered at the pleading stage.